Amanda S. Reynolds, Esq.
Attorney for Plaintiffs
3 Harvard Drive
Woodbury, New York 11797-3302
(516) 367-9795
AmandaSReynolds@gmail.com

## IN THE UNITED STATES DISTRICT COURT
### FOR THE NEW YORK EASTERN DISTRICT – CENTRAL ISLIP

| | |
|---|---|
| AMANDA REYNOLDS, individually and on behalf of all others similarly situated, | Civil Action No.: 2:24-cv-02636 (NJC-JMW) |
| **Plaintiffs,** | *Document Electronically Filed* |
| v. | **AMENDED CLASS ACTION COMPLAINT FOR DAMAGES & INJUNCTIVE RELIEF BASED ON:** |
| MERCY INVESTMENT SERVICES, INC., MERCY EDUCATION SYSTEM OF THE AMERICAS, SISTERS OF MERCY OF THE AMERICAS MID-ATLANTIC COMMUNITY, INC., OUR LADY OF MERCY ACADEMY, CORP., BOARD OF DIRECTORS OF OUR LADY OF MERCY ACADEMY, SISTER LISA GRIFFITH, Executive Director, MARGARET MYHAN, OLMA President, PATRICIA DILOLLO, OLMA Director of Advancement, and JANE AND JOHN DOE, fictitious names for the remaining Board of Directors members, | 1. **FRAUD** <br> 2. **BREACH OF FIDUCIARY DUTY** <br> 3. **BREACH OF CONTRACT** <br> 4. **BREACH OF CONTRACT** <br> 5. **UNJUST ENRICHMENT** <br> 6. **EQUITABLE ESTOPPEL** <br> 7. **VICARIOUS LIABILITY** <br> 8. **RES IPSA LOQUITUR** <br> 9. **AIDING AND ABETTING** |
| **Defendants.** | **JURY DEMANDED** |

Plaintiff, AMANDA REYNOLDS, individually and on behalf of a class of similarly situated persons, by and through counsel, hereby commences this action against Defendants MERCY INVESTMENT SERVICES, INC., MERCY EDUCATION SYSTEM OF THE AMERICAS, SISTERS OF MERCY OF THE AMERICAS MID-

ATLANTIC COMMUNITY, INC., OUR LADY OF MERCY ACADEMY, CORP., THE
BOARD OF DIRECTORS OF OUR LADY OF MERCY ACADEMY, SISTER LISA
GRIFFITH, MESA Executive Director, individually, OLMA President MARGARET
MYHAN, individually, OLMA Director of Advancement PATRICIA DILOLLO,
individually, and JANE and JOHN DOE, fictitious names for the remaining Board of
Directors members, individually, allege as follows upon information and belief:

JURISDICTION & VENUE

1.      This Court has jurisdiction over all causes of action alleged in this Complaint by
reason of diversity of citizenship of the parties, and the amount in controversy is over $75,000.
Plaintiffs reside in Nassau County and are situated throughout the United States, and Defendants
have principal places of business in New York, Maryland and across the United States.

2.      Moreover, upon information and belief, Defendant Mercy Investment Services
and Defendants Sisters of Mercy have orchestrated and implemented this scheme across the
country in each and every state to presently or previously owned Mercy properties including
schools and hospitals, thus imputing jurisdiction to this Honorable Court on the basis of diversity
of citizenship.

3.      Jurisdiction over all Defendants is proper because defendants availed themselves
of New York as a venue by conducting business in the State of New York, sustaining minimum
contacts in New York to render the exercise of jurisdiction by New York Courts permissible
under the traditional notions of fair play and substantial justice.

4.      Venue is proper in this Court because: a significant number of Plaintiffs reside on
Long Island; Our Lady of Mercy Academy is located in Syosset, Nassau County, New York, and
where substantial witnesses and agents reside or work in New York.

5.      Venue is proper pursuant to 28 U.S.C Section 1391 because a substantial part of the events giving rise to this claim occurred in this District.

6.      Venue is proper pursuant to 28 U.S.C. Section 1391 since Defendants are authorized to conduct business or reside in this District and have intentionally availed themselves of the laws and markets within this District.

7.      Pursuant to 28 U.S.C. Section 1332(a) this Court circumscribes original jurisdiction since the matter in controversy exceeds $75,000 exclusive of interest and costs and is between and among citizens of different States.

8.      Federal questions of law supporting federal jurisdiction will be further revealed during the course of discovery, including but not limited to: the details of the scheme orchestrated by Defendants across the country and, upon information and belief, outside U.S. borders, to foreign countries.

9.      This Honorable Court circumscribes jurisdiction pursuant to the Class Action Fairness Act, 28 U.S.C. Section 1332(d).  Upon information and belief, the aggregate claims of the individual Class Members exceed the sum or value of $5,000,000.00, exclusive of interest and costs; there are more than 100 putative class members, defined below; and there are numerous members of the proposed class who are citizens of a state different from defendant.

## CLASS CERTIFICATION

10.     Plaintiff brings this suit individually and on behalf of all others similarly situated pursuant to Rule 23(b)(2), (b)(3), (c)(4) of the Federal Rules of Civil Procedure.  Plaintiff seeks certification of Nationwide and state and subclasses as set forth herein, including all Mercy-educated stakeholders affected by the scheme orchestrated by some or all Defendants in concert with potential not-yet-named Defendants who worked in concert with presently-named Defendants, as subdivided by school affected and, therefore, by geographic location.

11.     Additionally, Plaintiff is a member of and seeks to represent a New York subclass pursuant to Fed. R. Civ. P. 23(b)(2), (b)(3) and/or (b)(4), defined as:  All Our Lady of Mercy Academy Syosset stakeholders affected by the Defendants' tortious acts and/or omissions.

12.     **Numerosity:** Fed. R. Civ. P. 23(a)(1).  The Class Members are so numerous that joinder of all Members is impractical.  While the exact number of class numbers is unknown to Plaintiff at this time, upon information and belief, Plaintiff expects the Class size to consist of thousands of members.

13.     **Commonality:**  Fed. R. Civ. P. 23(a)92) and (b093).  There are questions of law and fact common to the Class, that predominate over any questions affecting only individual Class Members.   These common questions of law and fact include, without limitation: (a) whether Defendants owed duties to Plaintiff and the proposed class, the scope of those duties and if they breached those duties; (b) whether Defendant's conduct was unfair or unlawful; (c) whether Defendant breached its contracts with Plaintiffs and the proposed class; (d) whether Plaintiff and the Class have sustained damages as a result of Defendants' conduct alleged herein and, if so, what is the proper measure of such damages; and (e)  whether Plaintiff and the Class are entitled to recovery and injunctive relief.

14.     **Typicality:** Fed. R. Civ. P. 23(a)(3).  Plaintiffs claims are typical of those of other Class Members because Plaintiff is an alumnus of Our Lady of Mercy Academy and a donor, and, therefore affected by Defendants in a similar fashion to other Plaintiffs.  Plaintiff, though not presently a student, was a student of Our Lady of Mercy Academy from 1997 through 2001; therefore, Plaintiff is similarly situated to those students who are presently students, to alumni, and to other stakeholders of the school including donors and parents of present students.  Plaintiff advances the same claims and legal theories individually and on behalf of all other class

Members; there are no defenses unique to Plaintiff. Plaintiff's claims and those of Class Members arise from the same operative facts and are based on the same legal theories.

15.     **Adequacy of Representation.** Fed. R. Civ. P. 23(a)(4). Plaintiff will fairly and adequately represent the interests of the Class in that she has no disabling conflicts of interest that would be antagonistic or adverse to the Class Members. Plaintiff seeks no relief that is antagonistic or adverse to the Class Members and the infringement of the rights and the damages she suffered are typical of other Class Members. Plaintiff is an attorney experienced with litigation and Plaintiff intends to prosecute this action on her behalf and on behalf of the Class.

16.     **Superiority of Class Action.** Fed. R. Civ. P. 23(b)(3). Class litigation is an appropriate method for the fair and efficient adjudication of the claims involved. Class action treatment is superior to all other available methods for the fair and efficient adjudication of the controversy alleged herein; it will permit a large number of Class Members to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of evidence, effort and expense that hundreds of individual actions would require. Class action treatment will permit the adjudication of relatively modest claims by certain Class Members, who could not individually afford to litigate a complex claim against large corporations, like Defendants. Further, even for those Class Members who could afford to litigate such a claim, it would still be economically impractical and impose a burden on the courts.

17.     The nature of this action and the nature of laws available to Plaintiff and the Class make the use of class action device a particularly efficient and appropriate procedure to afford relief to Plaintiff and the Class for the wrongs alleged because Defendants would necessarily gain an unconscionable advantage since Defendants would be able to exploit and overwhelm the

limited resources of each individual Class Member with superior financial and legal resources; the costs of individual suits could unreasonably consume the amounts that would be recovered; proof of a common course of conduct to which Plaintiff was exposed is representative of that experienced by the Class and will establish the right of each Class Member to recover on the cause of action alleged, and individual actions would create a risk of inconsistent results and would be unnecessary and duplicative of this litigation.

18.     The litigation of the claims brought herein is manageable.  Defendants' uniform conduct, the consistent provisions of the relevant laws, and the ascertainable identities of Class Members demonstrate that there would be no significant manageability problems with prosecuting this lawsuit as a Class Action.

19.     **Adequate Notice:** can be given to Class Members directly using information maintained in Defendants' records and on the Change.org petition or those who have formed a coalition to preserve Our Lady of Mercy Academy and/or other schools.

20.     Likewise, particular issues under Rule 239c)(4) are appropriate for certification because such claims present only particular, common issues, the resolution of which would advance the disposition of this matter and parties' interest therein.

## PARTIES

21.     Plaintiff, Amanda Reynolds, is an individual, natural person who presently resides in Nassau County, New York.

22.     Plaintiff is an alumnus of Our Lady of Mercy Academy's Class of 2001.

23.     Plaintiffs similarly situated to Plaintiff are the Our Lady of Mercy Academy stakeholders.

24.     Our Lady of Mercy Academy "stakeholders" shall include, but not be limited unnecessarily to: Our Lady of Mercy Academy alumnae and donors who have a vested interested in their high school alma mater.

25.     Our Lady of Mercy Academy "stakeholders" shall also include, but not be unnecessarily limited to the alumnae and donors of those other Catherine McAuley and other Catholic-sponsored educational institutions across the United States of America forced to close their doors at the hands of these institutional, malfeasant defendants either identified or whom remain unidentified in their entirety, but whom further discovery shall reveal exist.

26.     Plaintiffs shall also include the stakeholders of other Catholic institutions across that nation that have closed and who, upon information and belief, utilized Defendant Mercy Investment Services as a fiduciary including, but not limited to: Mercy (San Francisco); Mother of Mercy High School (Cincinnati); St. Mary School (Bordentown, New Jersey); Our Lady of Mercy School (Connecticut); Mount Alvernia High School (Newtown, Massachusetts); St. Joseph Prep (Boston); Matignon High School (Cambridge, Massachusetts); Our Lady of Good Counsel (Little Rock, Arkansas); Mercy High School (Burlingame, California); Divine Mercy Catholic Academy (Florida); Our Lady of Mercy School (Hicksville, New York); Mercy Hospital (Iowa City, Iowa); St. Ann School (Hawaii); Our Lady of Victory (Georgia); Mercy Hospital (Kansas); Ascension of Our Lord Catholic School (LaPlace, Louisiana); Old Divine Mercy (Minnesota); Mercy Hospital Unity Campus (Minnesota); St. Roch School (Missouri); House of Mary Rosemount Center (Mount Pleasant, D.C.); Mercy One Oakland Medical Center (Nebraska); Trinity Catholic High School (Nevada); Immaculate Conception School (Memphis, Tennessee); Mercy High School (Riverhead, New York); Sisters of Mercy Convent (Burlington, Vermont).

27.     Plaintiffs similarly situated to Plaintiff shall also include the Our Lady of Mercy Academy Syosset stakeholders, who include donors, parents, students, teachers, staff and employees, alumnae, and the individual Sisters of Mercy who worked at the school and dedicated their lives to its legacy.

28.     Since the subset of Plaintiffs, the Sisters of Mercy individually, are bound by a religious vow of obedience, these particular Sisters of Mercy are religiously precluded from disobeying or, bringing suit, against their Order; as a result, their inclusion in this class is a necessary prerequisite for the procurement and enforcement of their civil rights.

29.     Upon information and belief, Mercy schools across the country were operated on the same model as Our Lady of Mercy Academy and closed in the same manner.

30.     Mercy Schools across the country that have closed, closed upon the same fraudulent grounds, rendering the class of plaintiffs expansive and national, imputing further jurisdiction upon this federal court.

31.     The Plaintiff class of stakeholders in these closed schools and/or hospitals includes all stakeholders across the nation affected by Defendants' scheme to infiltrate these organizations with the intent of appointing a new administration for the sole purpose of bankrupting the organization and transferring the organization's real property assets and other assets into Defendants' pockets upon the organization's dissolution or closure.

32.     Plaintiffs affirmatively assert standing since the circumstances surrounding the allegations are those that are capable of occurring, yet evading review across the United States since Defendants' scheme is carried out tacitly, without notice to Plaintiffs, who, upon notification of the organization's closure are left without adequate time, resources or evidence to defend their stakes.

33.     Defendant, Mercy Investment Services, Inc., is a foreign, not-for-profit corporation with a principal place of business located at 2039 North Geyer Road, Saint Louis, Missouri 63131.

34.     Defendant, Mercy Education System of the Americas ("MESA") is a sponsored ministry of the Institute of the Sisters of Mercy of the Americas.

35.     Defendant, MESA's, principal place of business is located at 8403 Colesville Rd., Silver Spring Maryland, 20910.

36.     According to its website, MESA's Mission Statement is as follows: "The Mercy Education System of the Americas is rooted in the Gospel, through the Catholic faith and the Mercy charism.  Inspired by Catherine McAuley, Mercy Education nurtures highly competent and deeply compassionate leaders to serve a vulnerable world."

37.     MESA claims it has a firm Catholic identity: "The school gives evidence of its Catholic Identity in its curricular offerings, prayer and liturgical life, retreats and service opportunities."

38.     Defendant Sisters of Mercy of the Americas Mid-Atlantic Community, Inc., ("Sisters of Mercy") is a foreign, not-for-profit corporation pursuant to Section 1304, registered in New York.

39.     Defendant, Sisters of Mercy maintains a principal place of business located at 1437 Blossom Road, Rochester, New York 14610.

40.     According to its bylaws, Defendant, Our Lady of Mercy Academy Corp., is a New York State non-profit educational corporation.

41.     Defendant, Our Lady of Mercy Academy's principal place of business is located at 815 Convent Road, Syosset, Nassau County, New York 11791.

42.     According to its bylaws, the Mission of the Corporation shall be the operation of a Catholic high school for young women, where the arts and sciences are taught and diplomas and honors are conferred in furtherance of and consonant with the system of motivating beliefs, concepts and principles as set forth in Statement of Philosophy.

43.     According to its website, "the defining characteristic of the school is a focus on faith, compassion, and promise in educating young women to achieve their fullest potential."

44.     According to its website, Our Lady of Mercy Academy is sponsored by the Sisters of Mercy of the Americas and these qualities reflect the Mercy Mission.

45.     Defendant, The Board of Directors of Our Lady of Mercy Academy, is comprised of individuals who operate with a principal place of business located at 815 Convent Road, Syosset, Nassau County, New York, 11791.

46.     Upon information and belief, the Board of Directors of Our Lady of Mercy Academy is guided by Church governance, canonical and civil law and includes OLMA's President, Margaret Myhan and Zully Petrucci, Principal.

47.     Defendant Margarete Myhan, OLMA President, is a natural citizen who maintains an office address at 815 Convent Road, Syosset, Nassau County, New York who is believed to reside in Suffolk or Nassau County.

48.     Defendant Patricia DiLollo, OLMA's Director of Advancement, is a natural citizen who is employed by OLMA and who maintains an office address at 815 Convent Road, Syosset New York at OLMA and who is believed to reside in Suffolk or Nassau County.

49.     Defendants Jane and John Doe are fictitious names used as placeholders for the remaining individual members of the Board of Directors of Our Lady of Mercy Academy whose names are presently unknown.

50.     Plaintiffs are informed, believe and allege that each of the Defendants acted previously, acts, and will continue to act as the agent, servant, employee or representative of each of the other Defendants in doing or in failing to do the things alleged in this Complaint, and each Defendant is therefore jointly and severally liable for the acts and/or omissions of each of the other Defendants.

## FACTUAL BACKGROUND

*Our Lady of Mercy Academy*

51.     Our Lady of Mercy Academy ("OLMA") is one of only two private, Catholic all-girls high schools remaining on Long Island.  The school's mission is dedicated to providing a comprehensive education grounded in the charism of Catherine McAuley, foundress of the Sisters of Mercy.  Guided by the principals of Fides, Mores and Cultura (Fidelity to Principle, Moral Integrity and Enrichment of Life), Mercy provides a compassionate environment in which faculty fosters the spiritual, emotional and intellectual growth of the students endeavoring that Mercy graduates will be authentic witnesses of Catholic values throughout their lives.

52.     The Academy is run by the Sisters of Mercy of the Americas, who merged with the Sisters of Mercy of Brooklyn.  In 2017, Mercy Education Systems of the Americas ("MESA") came in and appointed new leadership and created a new leadership, Principal-President model, thereby segregating the roles between it and OLMA.  The President was responsible for all the finances and the Principal was responsible for student performance and reported up to the President.  The President then reported up to MESA, who reported to Sisters of the Americas and, it follows, Mercy Investment Services, its financier.

*Mercy High School San Francisco Closure*

53.     Relatedly, the most recent closure of a Mercy school occurred in 2020 in San Francisco:  Mercy High School was a Catholic all-girls college-preparatory high school part of the Roman Catholic Archdiocese of San Francisco, sponsored by the Sisters of Mercy in Dublin, Ireland.  In January 2020, Mercy San Francisco announced that it would close at the end of the 2019–2020 school year, citing decreased enrollment figures, a shrinking endowment, and the high cost of living in San Francisco that made private school tuition difficult to afford for many families.

54.     Mercy San Francisco's *nearly identical* closure announcement stated:

The combination of decreasing enrollment, the lack of a significant endowment, and rising operating expenses has made it impossible for the school to maintain financial stability. The basic demographics and economics in San Francisco have changed and many families can no longer afford to live in the city and pay tuition on top of the cost of living. The mission of the Sisters has been to educate young women, regardless of the ability of their families to afford a Catholic education.

55.     Mercy San Francisco school was built in 2001 and, like Our Lady of Mercy Academy, was dedicated to Catherine McAuley. The school permanently closed in the summer of 2020.  Its then students, who expected a four-year high school term, were displaced abruptly with no school to call home.

56.     In that scenario, the school was sold to an international, Chinese American International School ("CAIS"), for Forty Million ($40,000,000.00).

OLMA's *January 8, 2024 Closure Announcement*

57.     On January 8, 2024, the Board of Administration of Our Lady of Mercy Academy announced its June 2024 closure to its students, alumnae, including Plaintiff, and its "Circle of Mercy."  This was the first time OLMA and Defendants notified OLMA's stakeholders (its students, alumnae, donors, parents, and the community) of the impending closure.  According to

Defendants MESA, Sisters of Mercy and OLMA Board, the first they were made aware of the decision was two days before Christmas.

58.     Our Lady of Mercy's closure announcement to its alumnae stated, in part:

It is with great sadness that we announce the closing of Our Lady of Mercy Academy at the conclusion of this school year. This difficult decision was made because of changing demographics and lower enrollment which has decreased by 45 percent in the past 10 years. This announcement comes as a result of extensive deliberations by the school's leadership and governing boards: OLMA Board of Directors, Mercy Education Board of Directors, and the Institute of the Sisters of Mercy, who have tirelessly worked to sustain the school's viability in the face of many evolving educational landscapes.

59.     Upon hearing this news, Our Lady of Mercy Academy stakeholders (also known as "The Circle of Mercy" or, now, "The Lion's Den") began a campaign to preempt the impending closure, initially starting a Change.org Petition garnering over 7,000 signatures, a GoFundMe page started by present student advocate, Grace Werner, and then converting those endeavors into a non-profit.

60.     Meetings were conducted with students, parents, and e-mail communications were disseminated. On January 16, 2024, "An Important Message from Our Lady of Mercy Academy" email was disseminated from Defendant, President Margaret Mayan, which acknowledges that the students, parents and alumni hoped to: identify new fundraising initiatives and commitments to reverse the closure of the Academy; have an opportunity to engage in an in-person meeting with the Institute Leadership Team; and gain clarification on the possibility of selling/leasing the OLMA property owned by the Sisters of Mercy to offset the deficit and sustain OLMA. In response, MESA issued a letter by Sr. Lisa Griffith and Mr. Terry Quinn.

61.     The Mercy Education Systems of the America response stated simply, in part, that MESA was not interested in allowing Our Lady of Mercy Academy supports the opportunity to save its school: "1. The vote and approval of closure is final and will not be reconsidered.

13

Neither the Institute Leadership Team nor the Mercy Education Board of Directors will engage in discussions about emergency fundraising to reverse these decisions, […] and (3) the building and surrounding land of Our Lady of Mercy Academy is not part of the closure process; the future use of the building and adjacent land has not been determined.  There are no [present] plans to sell or repurpose the building or the property."

*January 16, 2024 Alumnae Association Zoom Call With Defendants*

62.     On January 16, 2024, representatives from Defendant MESA and the Board of Directors of the OLMA Board conducted a Zoom call with its stakeholders and Alumnae to address questions posed prior to and during the conference.  A transcript of this Zoom call is annexed hereto and the statements made therein are incorporated herein as if fully set forth within the four corners of this Complaint.

63.     The statements made during the call constitute factual claims by the parties.  The Zoom                     recording                     was                     available                     at: **https://us02web.zoom.us/rec/share/Y4o4kJ0M_upFlB9oo3mtJy9XnsRHvnLAiPaOcaqz9eO WfFl1mc1_7Uq1jVKffJk-.hoCvsi7eB_ucuvxq**  and the meeting passcode is K#WT8#PS.  The Zoom recording was subsequently removed by Defendants.

64.     During that Zoom Interview, Defendant, Sister Lisa Griffith, the Executive Director of MESA, represented as follows with respect to the defendants' hierarchy:  MESA infiltrated the school in 2017.  Sister Griffith stated that MESA's role has two primary functions: (1) to provide programs and services to all ministries and (2) to provide governance oversight with the schools.  According to MESA, via its representative, Sister Lisa Griffith, the local school boards have a definite responsibility in leading the charge for having oversight and their own responsibilities, though MESA does provide best practices due to high Board attrition.

14

65. Sister Lisa Griffith represented that the school's closure was due to finances. The present cashflow would result in a "sizeable deficit" by August 2024; the school is operating at a deficit now. It was ultimately the decision of MESA to recommend the school's closure. MESA then requested approval for closure through the Institute Leadership Team, vis-à-vis the Sisters of Mercy of the Americas and Mercy Investment Services.

66. Defendant MESA's representative, Sister Lisa Griffith, further stated that MESA will not reconsider its vote based on information that is not concrete, meaning, unless she had actual donation-backed dollars, she would not consider the stakeholders' efforts to fundraise.

67. Defendant MESA's representative, Sister Lisa Griffith, also iterated that the Institute Leadership Team would not consider capitalizing on the fact that Mercy sits on 96 acres of property and would not borrow against the property or consider financing with respect to the real property whatsoever.

68. Notably, representatives from Mercy Investments were not present at the meeting and did not also state or concur that there were no plans with respect to the property.

69. It was clear from this meeting that despite thousands of promised dollars from its stakeholders, and even donations that were pledged but not expedited, MESA refuses to entertain the valiant efforts of its stakeholders to keep OLMA open. This 95 year-old institution, empowering women across America, will have to shut its doors.

70. Plaintiff, Amanda Reynolds, transcribed the video record from this Zoom call. A copy of that transcript is annexed hereto as Exhibit "A" and incorporated fully herein by reference. The statements made in that call are not assumed to be true, but are proffered merely for the fact that these statements were made by the respective parties' representatives, and, therefore, constitute further evidence of fraud on behalf of Defendants.

*Defendant Mercy Investment Services, Inc.*

71.     According to the Mercy Investment Services website, every six years, the Sisters of Mercy of the Americas hold Chapter to set direction and elect leadership for the coming years. In 2017, Mercy Investments had a call to "intensify their efforts to align their investments with their values" related to extractives.

72.     That same year, in 2017, Defendant Sisters of Mercy elected a new Institute Leadership Team, who took office in August.  The five Sisters also serve as the Members in Mercy Investment Services' two-tiered governance structure were: Suster Sue Sanders, RSM, president; Sr. Pat Flynn, RSM, Vice-President; Sr. Terri Bednarz, RSM Counsilor; Sr. Judith Frikker, RSM, councilor; Sr. Maureen King, RSM, councilor.

73.      In 2017, the same year that new leadership was elected, the Our Lady of Mercy Academy Bylaws were revised and effectuated.

74.     According to the investment company, "The Sisters of Mercy, in the spirit of their founder, Catherine McAuley, committed to using their investments to advocate for systemic change and enhance their financial resources for the mission and the support of their members. Building on decades of work in their history, the Sisters of Mercy created Mercy Investment Services, the asset management program for the collective investment and professional management of the endowment, operating, and other funds of the Sisters of Mercy and their ministries that chose to participate.  The centralization of investments occurred on February 1, 2010 and purported to increase the net investment returns of the participants while continuing the Sisters' decades-long work for systemic changes.  The program provides its participants with increased economies of scale, diversification, liquidity, and governance and oversight."

16

75.     The Mercy Partnership Fund is the global community investing program of MIS and provides below-market investments to mission-driven organizations and projects that provide high social and environmental impact.

76.     Again, according to the Mercy Investment Services website, what happened was: in the early 1970s, several provinces formed the Mercy Consolidated Asset Management Program (MCAMP) to collaboratively invest their funds and encourage more just business practices among the companies in which they invested.  In 1995, MCAMP created an Alternative Investment Fund, giving participants the option of contributing a portion of their investment to the community investing fund.  As the sisters' collaborative investment strategy grew, MCAMP evolved into Mercy Investment Program and incorporated the Alternative Investment Fund. Renamed Mercy Partnership Fund in 2003, the fund became part of Mercy Investment Services in 2010, and now, a portion of every participant's investment supports community investing. Today, Mercy Partnership Fund loans to more than 60 investees with investments in 59 countries and throughout the United States.   These investments support affordable housing, financial inclusion, education, business, cooperative and nonprofit financing, community facilities, health care, healthy food, environmental sustainability and sustainable agriculture.

77.     In 2023, MIS launched an initiative within the Mercy Funds and 80/20 Sponsored Ministry Fund to address the ongoing concern for racial equity and justice.  The Inclusive Fund invests in groups who have been shut out of traditional capital markets and "overlooked" by "mainstream" investors.

78.     Mercy Investment Services maintains several other committees comprised of lay people and nuns, including the following: Members; Board of Directors; Investment Committee;

Social Responsibility Committee; Mercy Partnership Fund Subcommittee; Audit Committee; Governance Committee; Compensation Committee.

79.     MIS' approach to investments includes: (1) Portfolio Screening; (2) shareholder advocacy; (3) proxy voting, and (4) impact investing.  Portfolio screening is a way to make a decision based upon the values of the organization or, the key concerns of what we decide we will not own in the investment program.

80.     Portfolio screens are a way to make a decision based upon the values of the organization and what again are key concerns.  The Sisters of Mercy portfolio screens to avoid investing in certain companies whose products, services or activities contradict its guiding principles.  Similarly, it actively seeks investments aligned with the guiding principles of the Sisters of Mercy.

81.     Shareholder advocacy is a means by which MIS encourages the companies they invest in to make changes that benefit the community.  They raise issues that concern the Sisters of Mercy to ensure that companies consider the impact of their business.  Currently, MIS engages 152 companies through 213 engagements. Proxy voting is used by actively voting company proxies using the Mercy Investment Services Proxy Voting Guidelines approved by the Social Responsibility Committee.  In advance of a company's annual shareholder meeting, the company releases its proxy book, which includes all the resolutions for shareholders to consider and on which to vote.  MISS, through ISS proxy voting service, votes all of its proxies in accordance with guiding principles focused on governance, social and environmental criteria.

***Mercy Investments 2023 Accountability Report***

82.     Notwithstanding the foregoing "vision", MIS' 2023 Accountability Report was negative overall.  The company had a negative absolute return in 2022.

83.     Defendant MIS cited "global inequity investment manager performance" as the primary detractor.  Put another way, the Company was blaming its performance on its proxy voters, rather than itself.  Though it claims that it diversified its portfolio, Defendant MIS represented that its "responsible" diversification was unrewarded.

84.     Defendant MIS then explained that despite clear statistics inviting investment in certain stocks, the company simply chose not to invest in what the rest of America did, which was characterized by MIS as investing in "large-cap, volatile, growth stocks" found in the "artificial intelligence and related technologies" sector."  These stocks outperformed value by nearly 24% in the first quarter of 2023.

85.     MIS claimed major American investing services benefited from what they called "euphoric" investment in "risky" stocks, despite also citing the fact that 7 stocks comprised 99% of the S&P 500's revenue and the NASDAQ had the best first quarter ever with 39% returns.  They concluded that despite their unrewarded responsible investing, that the Funds' net returns were "in line with their respective benchmarks since inception."

86.     The Mercy Investment Services Investment Return Record Trailing Annualized Total Return Next of Expenses as of June 30, 2023, showed the largest net expenses in the "Global Equity" fund.

87.     Mercy Investment Services was involved in other school closures and postured the real property of those Catholic schools to be sold for profits, after the schools were forced into the ground due to malfeasant business operations.

88.     Mercy Investment Services capitalizes on the Sisters' of Mercy requirement that funds donate to Do-Good investments only, and the fact that the Sisters' tax filings include beneficial privacy due to their status as a religious organization.  In this way, together with its

19

misrepresentations of investment performance, Defendant MIS hoped to evade liability since the Sisters' entity as a religious organization afforded Defendant MIS the privacy it needed to continue misappropriating its funds in furtherance of its tortious acts.

89.     Mercy Investment Services then sets up MESA as a strawman to further immunize it from liability, while directing recommendations for school closures from the top down.

*MESA Involvement with Our Lady of Mercy Academy*

90.     Allegedly, Defenant MESA only imparted to the OLMA Board its formal decision to close Our Lady of Mercy Academy on December 23, 2023, Defendant MESA had known of the school's impending closure years before.  That is because it planned it.

91.     With respect to OLMA, on April 5, 2018, MESA sent a letter to Mrs. Margaret Serravalli, Chairperson of the Board of Trustees, and Ms. Margaret Myhan, President of Our Lady of Mercy Academy, on behalf of the MESA Board and review time.  This letter provided a recommendation for OLMA Administration to: continue working to bring down the deficit in OLMA's annual budget; maintain the development of a strategic initiative for financial aid and recruitment, and to develop a formal succession plan for administration, faculty and staff. This letter was sent by Sr. Richard Mary Burke, RSM (Board Chair), and Sr. Lisa Griffith, RSM (Executive Director).

92.     Importantly, Our Lady of Mercy Academy's 2020-2021 Annual Report indicates that it raised $6,049,099. Its Total 2019 Revenue was: $7,237,636; its Total Expenses were: $7,492,456.

93. Its Reaccreditation Report in 2019 provided no recommendations for improvement with respect to its Plan for Growth and Improvement in the financial operations, budget, fundraising, capital campaigns or otherwise.

94. Following the announcement of Our Lady of Mercy Academy's closure, Mercy stakeholders banded together and imparted a willingness to raise more than the amount needed for viability through its network and a newly-founded Not-For-Profit, "Our Lady of Mercy Academy Preservation Coalition."

95. Notwithstanding the formation of the foregoing not-for-profit Coalition to save the school and its many proffered proposal for the school's salvation, Defendants refused to entertain any solutions notwithstanding their reasonableness.

96. Based on the recent trend across the United States in Catholic school closures with associated real property transfers of those multi-million dollar school properties, the OLMA students, parents and Alumni herein aggrieved humbly seek recourse in this Honorable Court and will also seek an injunction prohibiting the sale of the property, allowing OLMA's supporters to revive its beloved school and to oust the present Board and leadership.

97. Notably, Defendants have not provided Plaintiffs with any concrete accountings, audits, budgets, enrollment figures, specified and measured concrete plans for repurposing the school, or any other concrete statistics to date.   Their Capital Campaign funds were represented to be zero-sum in a 2020-2021 Capital Campaign statement located on its website.

98. Despite knowing that the school was nearing its demise, upon information and belief, Defendants, collectively, never communicated the school's closing until January 8, 2024.

99. Defendants knowingly and intentionally were involved in this scheme orchestrated by Mercy Investment Services from the top down.

100.    As a result of their involvement, these defendants who are named personally engaged in tortious acts constituting conduct outside the scope of their employment duties, and are sued herein personally and individually.

101.    Alternatively and simultaneously, to the extent that Defendants performed duties within their scope of employment, Defendants breached their fiduciary duties owed to Plaintiffs.

## GOVERNING DOCUMENTS

*OLMA ByLaws*

102.    A copy of the Our Lady of Mercy Bylaws effective in 2017 is annexed hereto as **Exhibit "B"**.

103.    According to the bylaws, The Board of Directors governs the affairs and business of the Corporation, and consists of not less than nine or more than twenty-five persons, two of whom shall be Sisters of Mercy.

104.    According to the bylaws, the Terms of election for the Directors shall ordinarily be four years.  A Director may be elected to two consecutive terms.

105.    According to the bylaws, a Director may resign at any time by giving written notice of his or her resignation to the Secretary of the Corporation.

106.    According to the bylaws, the President of School shall automatically be a member of the Board of Directors as long as she or he remains in that office.  The Principal of the school is a non-voting member of the Board.

107.    According to the bylaws, the Board of Directors shall meet as often as it specifies, including an Annual Meeting, Regular Meetings, and Special Meetings.

108.    According to the bylaws, a quorum on the Board is the presence of one-half of all qualified Directors required for a valid transaction of business at any meeting.  Each Director shall have one vote.

109.    According to the bylaws, General Powers of the Board include: (a) recruiting, selecting and recommending an eligible candidate to serve in the position of President of the school for ratification by MESA; conduct an annual appraisal of performance of the President; identify mutual goals and arrange appropriate compensation and related benefits; (b) Advise the President in the recruitment and selection of an eligible candidate to serve in the Position of Principal of the school; develop short and long range plans for the school to ensure the School's viability; review, evaluate and revise the Mission, Purpose and Philosophy and recommend to MESA for approval; (e) develop and approve major policies, including the setting of tuition and fees, employee and compensation policies, which guide the direction of the School; (f) provide through the President for adequate maintenance, upkeep and supervision of the land, buildings and other assets of the Corporation;

110.    According to the bylaws, General Powers of the Board, include also: (g) insuring sound fiscal management through implementation of good accounting principles and procedures; insure an annual audit and develop and approve an annual operating budget except where such operating and capital budgets require the approval of MESA.

111.    According to the bylaws, the Board's General Powers also include electing the Chair, Vice Chair, Secretary and Treasurer of the Corporation and to nominate, for approval by MESA, candidates for the Board of Directors.

112.    According to the bylaws, under Section 8 of the Bylaws, "Compensation", Directors as such shall not receive any compensation for their services; provided, however, that

23

nothing herein contained shall be construed to preclude any Director from serving the School in another capacity and receiving such compensation therefore as shall be approved by a quorum of disinterested Directors, except for reimbursement of such out-of-pocket expenditures as shall be approved by the Board of Directors.

113.    According to the bylaws, Section Nine, "Directors and Qualifications", Directors should have specific experience in organizational operations (e.g., administration, finance, public relations, personnel, and program development), and sign an annual conflict of interest and confidentiality statement, among other things.

*Executive Committee*

114.    According to the bylaws, under Article V of the Bylaws, entitled, "Executive Committee," the Executive Committee shall consist of the Chair of the Board, the President and up to three (3) other Board members, selected by the Chair and approved by the Board of Directors.  The Chair of the Board shall also chair this committee.

115.    According to the bylaws, between meetings of the Board, the Executive Committee may take such action as authorized by the Board and, in exigent circumstances, the Executive Committee may act on behalf oof the Board with the same effect as an action of the full Board.  The Executive Committee shall report all of its actions to the Board at the next meeting of the Board.

116.    According to the bylaws, pursuant to Article V, Section 2 of the Bylaws, the Executive Committee has all the powers of the Board, except it cannot: (a) amend or repeal any resolution previously adopted by the Board of Directors; (b) establish a budget, except that it may approve an interim operating budget until such time as the Board can meet to establish one;

approve any recommendation or report to the Board of Directors made by any committee, or (d) appoint or remove from office and Officer of the Corporation other than the Chair.

117.    According to the bylaws, pursuant to Article V, Section 4, "Records and Reports", the Executive Committee is responsible and accountable to the Board of Directors; minutes of meetings are to be recorded and fully reported at the next meeting of the Board of Directors; actions taken shall be ratified or they may be rescinded or modified as deemed necessary by the Board.

118.    According to the bylaws, Article VI, "Other Committees", Section 1 of the Bylaws states the Audit Committee shall be composed of independent directors; it shall oversee the accounting and financial reporting processes of the corporation and the audit of the corporation's financial statements, annually retain an independent auditor, and review the results of the audit and any related management letter with the independent auditor.

119.    According to the bylaws, pursuant to Article VII, Section 1, "Officers of the Corporation," the officers of the Corporation shall consist of a President, a Vice-President, a Secretary and a Treasurer.  The President shall

120.    According to the bylaws, pursuant to Section 2, "Responsibilities," subsection (a), "President," the President of the School shall be the Chief Executive Officer and have general charge and supervision of the business.  She shall be ex officio a non-voting member of tall committees appointee by the Board of Directors and shall make such reports of the affairs of the Corporation as the Board may require.  The office of the President of the Corporation and the School President shall be held by the same individual.

121.    According to the bylaws, pursuant to the Bylaws, Article VII, Section 2(b), the Vice President shall act in the absence of the President and shall perform such other duties as required.

122.    Pursuant to the Bylaws, Article VII, Section 2(c), the Secretary of the Board shall record all votes and prepare minutes of all proceedings of the Board of Directors; these records shall be maintained in the offices of the School and a current list of the names and addresses of all Directors shall be on file and available.  Notice of meetings and such other duties as described in the By-laws or requested by the Board shall be performed by the Secretary.

123.    Pursuant to the Bylaws, Article VII, Section 2(d), the Treasurer of the Board shall have general charge of the financial affairs of the Corporation and the care and custody and disbursement of its funds and securities, and shall deposit all funds and securities of the Corporation to the credit or in the name of the Corporation in such banks, trust companies, or other depositories as may be selected from time to time by the Board of Directors.  The Treasurer shall insure that accurate records of all financial accounts and transactions are maintained and available to any Director and the Chair.  In collaboration with the Chair, financial statements shall be prepared and an annual audit conducted if designated by the Board of Directors.  The Treasurer shall also perform such other duties as may be assigned from time to time by the Board of Directors or the Board of the President of the School.

124.    Pursuant to the Bylaws, Article VII, Section 4, "Vacancies", Any vacancy caused by death, incapacity, resignation or removal of an Officer of the Corporation shall be filled by the Board of Directors at a duly constituted meeting thereof, subject to the limitations of Section 1 of this Article.

125.     Pursuant to the Bylaws, Article VIII, "Staff of the School," Section 1 "Principal," the office of Principal shall be responsible for the daily operation and management of the school and in collaboration with the President shall provide leadership and direction for the long term interests and welfare of the School in accord with the priorities and directives of the Board and the President.

126.     Pursuant to the Bylaws, Article VIII, Section 2 "Business Manager," the Business Manager, under the general direction and supervision of the President of the school, shall perform such duties and have such administrative powers as the President shall from time to time delegate to this office.   Additionally, the Business Manager shall perform such day-to-day functions as delegated by the Treasurer of the Corporation and shall keep and maintain such financial records and shall prepare such reports with respect thereto as the Treasurer of the Corporation shall reasonably require.

127.     Pursuant to the Bylaws, Article IX, "Execution of Documents." all checks, drafts, orders and other similar instruments for the payment of money including the regular payroll shall be executed by any two of the following: the President of the School, Treasurer of the Corporation, or the Business Manager.   No check or other instrument for the payment of money to the School shall be endorsed otherwise than for deposit to the general account of the School unless otherwise restricted by the payee.   All checks of the School shall be drawn to the order of the payee.   Each bank account of the School shall be stablished and continued by resolution of the Board of Directors.

128.     Pursuant to the Bylaws, Article XII, governing Indemnification of Members, Directors, Officers and Staff, the Corporation is responsible for indemnifying its members if the

member acted in good faith and was not the cause of said action and had no reasonable cause to believe her conduct was unlawful.

*Conflicts of Interest*

129.    Pursuant to the Bylaws, Article XIV, "Conflict of Interest", "any conflict of interest on the part of any member of the Board of Directors should be disclosed to the other Directors and made a matter of record when the possible conflict relates to a matter of Board action.  Any Director having a possible conflict on a matter before the Board of Directors should not be counted in determining the quorum for the meeting at which action is taken on the matter, even when permitted by law.  The minutes of the meeting should reflect that disclosure of the possible conflict of interest was made, that the interested Director abstained from voting and that her presence was not counted in determining a quorum.  These requirements should not be construed as preventing a Director from stating her position on the matter on which she may have a possible conflict of interest, nor from answering questions of other Directors, recognizing that the Director's knowledge may be of great assistance to the Board of Directors.

*Dissolution*

130.    Pursuant to the Bylaws, Article XV, "Dissolution", "upon dissolution, merger, or consolidation of this Corporation, all property of the Corporation after payment of any debts shall devolve upon the Sisters of Mercy of the Americas, Inc. a Missouri Not-for-Profit Corporation, or its successor according to a plan adopted by the Members of the Corporation and approved by the Members of the Corporation prior to submission to a Justice of the Supreme Court in New York, provided that at such time, any recipient of remaining funds shall qualify as

an organization described in Section 501(c)(3) of the Internal Revenue Code of 1986 as amended.

131. The OLMA students, parents and Alumni were never informed of any dire financial distress the school was undergoing in the last 10 years.

132. The OLMA students, parents and Alumni and other friends of Mercy contributed donations at the soliciting of Defendants, OLMA, its agents and subsidiaries, relying upon the promise that the school would remain open.

133. The OLMA students and parents paid tuition to the school with the understanding that the school was going to remain open for the four years, from 9th through 12th grade, that were intended by the payment of such tuition.

### FIRST CAUSE OF ACTION – Fraud
### (Against All Defendants)

134. Plaintiffs repeat, reallege and reiterate all foregoing paragraphs as if fully set forth herein.

135. Defendants made material misrepresentations or omissions of fact.

136. Upon information and belief, Defendants' material misrepresentations or omissions of fact include, but are not limited to, representations that the monies paid would be used in accordance with Plaintiffs' intentions; that the monies paid would be used for the benefit and viability of Our Lady of Mercy Academy; and that they were soliciting such payments for that purpose; that OLMA's property is not postured for sale or alienation in any way whatsoever.

137. The nature of Defendants' money-laundering scheme is largely unknown at this early stage; further evidence shall be revealed during discovery. Therefore, the specifics of the fraudulent acts and/or omissions and statements also may remain unknown without the benefit of further investigation and discovery. Notwithstanding and without waiving the foregoing caveats,

Defendants' material misrepresentations and/or failure to affirmatively make representations constitutes the heart of Plaintiffs' fraud claim.

138.     Defendants made these statements or included these omissions with knowledge of their falsity.

139.     Defendants made these statements and/or omissions with the intent to defraud Plaintiffs and the community.

140.     Plaintiffs reasonably relied on these statements when they paid these monies and/or agreed to pay tuition; agreed to attend Our Lady of Mercy Academy; agreed to work at Our Lady of Mercy Academy; agreed to fundraise and contribute time, efforts, and talents for the collective benefit of Our Lady of Mercy Academy; in that Defendants stated they would entertain fundraising efforts by the stakeholders when, in fact, they have no intention of doing so, among other things.

141.     Because of their positions of control and authority, Defendants were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein, exclusively.

142.     Defendants also breached material provisions of the governing Bylaws.

143.     Defendants' breach of duty resulted in damages to the Plaintiffs.

144.     Defendants' breach of duty is the but-for cause of Plaintiffs damages.

145.     Defendants' breach of duty is the proximate cause of Plaintiffs' damages.

146.     Defendants breach of duty was the proximate cause of Plaintiffs' damages.

147.     Plaintiffs in no way contributed to their own damages.

148.     Plaintiffs sustained damages in many forms including monetary damages, and will sustain the loss of Our Lady of Mercy Academy, an irreplaceable all-girls Catholic school.

**SECOND CAUSE OF ACTION – Breach of Fiduciary Duty**

149.    Plaintiffs repeat, reallege and reiterate all foregoing paragraphs  as if fully set forth herein.

150.    A fiduciary duty existed between Defendants and Plaintiffs.

151.    Each individual Defendant owed to Plaintiffs the fiduciary duty of loyalty and good faith, the exercise of due care and diligence in managing and overseeing Our Lady of Mercy Academy's affairs, as well as the use and preservation of its property and assets.

152.    As directors and/or officers of Our Lady of Mercy Academy, Defendants owed fiduciary duties to Our Lady of Mercy Academy stakeholders, including the duties of loyalty and care at all relevant times alleged herein.  Defendants were required to exercise candor and to act on an informed basis, in the best interests of Our Lady of Mercy Academy and its stakeholders, in the management and administration of Our Lady of Mercy Academy's business and affairs.

153.    Defendants owed Plaintiffs a duty to act responsibly, in a manner in accordance with their duties and responsibilities with respect to Defendant entities.

154.    Defendants' fiduciary duty created a relationship of trust and confidence whereby Defendants were bound to exercise the utmost good faith and undivided loyalty toward Plaintiffs and to Our Lady of Mercy Academy, throughout the relationship.

155.    This fiduciary duty also required Defendants to act in a trustworthy manner, with honesty, and with the best interests of the company in mind.

156.    This fiduciary duty was created by statute.

157.    This fiduciary duty was created by circumstances underlying the relationship between the parties and the nature of the transactions at issue.

158.     The Defendants' misconduct involves a knowing and culpable violation of their obligations as directors and officers of Our Lady of Mercy Academy, the absence of good faith, or a reckless disregard of their duties that they were aware of or should have been aware posed a risk of serious harm to OLMA.

159.     Each Defendant ratified each other's misconduct because they collectively comprised OLMA's Board and management at all relevant times.

160.     Defendants breached their fiduciary duty owed to Plaintiffs when they acted for their own benefit, rather than for the benefit of Our Lady of Mercy Academy, and, it follows, its students, employees, alumni and community.

161.     Defendants breached their duties of loyalty and good faith by allowing Defendants to cause, or by themselves causing, false and/or misleading statements and/or failing to disclose that OLMA's financials were suffering from material vulnerabilities that Defendants failed to timely remedy.

162.     Defendants breached their fiduciary duty when they violated their own Bylaws.

163.     Defendants breach of duty was the but-for cause of Plaintiffs' damages.

164.     Defendants breach of duty was the proximate cause of Plaintiffs' damages.

165.     Plaintiffs in no way contributed to their own damages.

166.     Plaintiffs sustained damages in many forms including monetary damages, and will sustain the loss of Our Lady of Mercy Academy, an irreplaceable all-girls Catholic school.

**THIRD CAUSE OF ACTION – Breach of Contract**

167.     Plaintiffs repeat, reallege and reiterate all foregoing paragraphs as if fully set forth herein.

168.   Defendants and Plaintiff stakeholders entered into a contract whereby Plaintiffs paid money in the form of tuition and donations intended to inure to the benefit of Our Lady of Mercy Academy and other affected schools and its viability in exchange for Defendants' educational services.

169.   Defendants misappropriated monies paid by Plaintiffs for other purposes not intended for the use of Our Lady of Mercy Academy as intended by Plaintiffs at the time the money was paid.

170.   Defendants owed Plaintiffs a duty to use the monies donated and paid responsibly and in accordance with Plaintiffs' intentions.

171.   Defendants breached their duty owed to Plaintiffs when they misappropriated and misdirected Plaintiffs' money.

172.   Defendants' breach of duty is the but-for cause of Plaintiffs damages.

173.   Defendants' breach of duty is the proximate cause of Plaintiffs' damages.

174.   Defendants breach of duty was the proximate cause of Plaintiffs' damages.

175.   Plaintiffs in no way contributed to their own damages.

176.   Plaintiffs sustained damages in many forms including monetary damages, and will sustain the loss of Our Lady of Mercy Academy, an irreplaceable all-girls Catholic school.

### FOURTH CAUSE OF ACTION – Breach of Contract (Lease)
As Against All Defendants

177.   Plaintiffs repeat, reallege and reiterate all foregoing paragraphs as if fully set forth herein.

178.   Plaintiff students are expressly and impliedly third-party beneficiaries of the lease agreement between and/or among Defendants.

179.    Plaintiff students enjoyed the use, possession and operation of Our Lady of Mercy Academy's campus.

180.    The breaches of contract among defendants with respect to the lease agreements resulted in a breach of their duties owed to Plaintiffs, who are third-party beneficiaries of the lease agreement, expressly and impliedly.

181.    Plaintiffs will sustain damages upon the closure of Our Lady of Mercy Academy in that they will no longer have a high school to attend.

182.    Defendants breached their duty owed to Plaintiff in the failure to renew the lease and will breach their duty owed if they fail to permit Our Lady of Mercy Academy to stay open for its students.

183.    Defendants' breach of duty is the proximate cause of Plaintiffs' damages.

184.    Defendants breach of duty was the proximate cause of Plaintiffs' damages.

185.    Plaintiffs in no way contributed to their own damages.

186.    Plaintiffs sustained damages in many forms including monetary damages, and will sustain the loss of Our Lady of Mercy Academy, an irreplaceable all-girls Catholic school.

**FIFTH CAUSE OF ACTION – Unjust Enrichment**
As Against All Defendants

187.    Plaintiffs repeat, reallege and reiterate all foregoing as if fully set forth herein.

188.    Defendants owed Plaintiffs a duty to earmark and use any funds intended for the benefit of Our Lady of Mercy Academy to be used for OLMA's sole benefit.

189.    Defendants were enriched through Plaintiffs' payment of money, donation of time, talents and fundraising.

190.    Defendants were enriched at Plaintiffs' expense.

191.     Defendants' enrichment offends equity and good conscience to permit them to retain what is sought to be recovered.

### SIXTH  CAUSE OF ACTION - Equitable Estoppel
As Against All Defendants

192.     Plaintiffs repeat, reallege and reiterate all foregoing as if fully set forth herein.

193.     Plaintiffs detrimentally relied on Defendants' promise to utilize the monies paid for the benefit of Our Lady of Mercy Academy.

194.     Defendants' promise was a promise which Defendants should have, and did, reasonably expect to induce action on the part of Plaintiffs to third parties and did induce such action.

195.     Plaintiffs' reliance was reasonable for reasons including that they were paid in the form of time, tuition and donations and other forms of money.

196.     Injustice can only be avoided by issuing to Plaintiffs fair damages in addition to specific performance.

### SEVENTH CAUSE OF ACTION – VICARIOUS LIABILITY

197.     Plaintiffs repeat, reallege and reiterate all foregoing paragraphs if fully set forth herein.

198.     Defendants are vicariously liable for the actions perpetrated by their employees, agents, and/or subsidiaries.

199.     Defendants maintain ownership, operation, control, and governance over the defendant subsidiaries.

200.     To the extent that Plaintiffs were damaged by act and/or omissions perpetrated by Defendants in their course of employment, the overarching Defendants are imputed liability vicariously herein.

201.    To the extent that Plaintiffs were damaged by acts and/or omissions perpetrated by Defendants outside the scope of employment, those Defendants are personally liable for damages.


## EIGHTH CAUSE OF ACTION – RES IPSA LOQUITUR

202.    Plaintiffs repeat, reallege and reiterate all foregoing paragraphs if fully set forth herein.

203.    Given that Our Lady of Mercy Academy remained liquid, solvent and operable for nearly 100 years, the very existence of its financial demise cannot be explained without negligence.

204.    Defendants maintained exclusive control over Our Lady of Mercy Academy.

205.    There is absolutely no contributory negligence on the part of the Plaintiffs.

206.    Defendants' reckless, willful and/or contumaciously negligent operation of Our Lady of Mercy Academy, which Defendants exclusively controlled, oversaw, operated, maintained and managed, in tandem with Defendants' refusal to entertain remedial and mitigation efforts proffered in part by Plaintiffs in addition to Defendants' refusal to implement mitigation and remedial efforts themselves, is evidence of *Res Ipsa Loquitur*.

207.    *Res Ipsa Loquitur* is also alleged here, where Defendants' exclusive control over Our Lady of Mercy Academy unilaterally inured Defendants with the benefit of exclusive control over Our Lady of Mercy Academy's records to the detriment of Plaintiffs, including but not limited to: financial records, management records, operational records and other documents that, if withheld or destroyed serve as further evidence of wrongdoing.

208.    Defendants' negligence vis-à-vis *res ipsa loquitur* constitutes a breach of duty owed to Plaintiffs, who are and were at all relevant times, stakeholders in Our Lady of Mercy Academy.

209.    Defendants' breach of duty vis-à-vis *res ipsa loquitur* caused Plaintiffs, stakeholders in the Academy, damages.

210.    Plaintiffs' damages were caused in fact by Defendants' breach of duty owed to Plaintiffs.

211.    Plaintiffs' damages were proximately caused by Defendants' breach of duty owed to Plaintiffs.

212.    Defendants, collectively, must be held accountable for the damages owed to Plaintiffs.

### NINTH CAUSE OF ACTION – Aiding and Abetting
As Against All Defendants

212.    Plaintiffs repeat, reallege and reiterate all foregoing paragraphs if fully set forth herein.

213.    In committing the wrongful acts alleged herein, Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their wrongdoing.  Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

214.    Defendants collectively and individually initiated a course of conduct that was designed to and did conceal the fact that Our Lady of Mercy Academy's viability was in danger, and that itself caused Our Lady of Mercy's financial ruin.  In furtherance of this plan, conspiracy and course of conduct, the Defendants collectively and individually took the actions set forth herein.

215.    Defendants engaged in a conspiracy, common enterprise, and/or common course of conduct.  The Defendants accomplished their conspiracy, common enterprise, and/or common course of conduct by infiltrating Our Lady of Mercy Academy's administration, allowing the school to fall into financial ruin, and refusing to permit stakeholders to remedy the solution to keep the school viable and operable.  The Defendants knew or should have known of Our Lady of Mercy Academy's financial status based on their respective relationships to the school, as members of the Board, or representatives of the school's operating authorities.  Because the actions described herein occurred under the authority of the Board, Defendant MESA and Defendant Sisters of the America, each of the Defendants was a direct, necessary and substantial participant in the conspiracy, common enterprise, and/or common course of conduct complained of herein.

216.    Plaintiffs repeat, reallege and reiterate all foregoing paragraphs if fully set forth herein.

217.    The purpose and effect of the Defendants' conspiracy, common enterprise, and/or common course of conduct was, among other things, to conceal from OLMA stakeholders the financial status of the school.

218.    Each individual Defendant aided and abetted and rendered substantial assistance in the wrongs complained of herein.  In taking such actions to substantially assist the commissions of the wrongdoing complained of herein, each Defendant acted with knowledge of the primary wrongdoing, substantially assisted the accomplishment of that wrongdoing, and was aware of his or her overall contribution to and furtherance of the wrongdoing.

**DAMAGES TO OUR LADY OF MERCY ACADEMY STAKEHOLDERS**

219.    Our Lady of Mercy Academy stakeholders (Plaintiffs) have and will continue to be severely damaged and injured by the Defendants' misconduct.

220.   As a direct and proximate result of the Defendants' misconduct, Plaintiffs have expended and will continue to suffer from significant losses.  Such expenditures include, but are not limited to:

> (a)  loss of reputation, good will and business;

> (b)  loss of enrollment, and, it follows, loss of endowment funds and capital;

> (c)   loss of employees (teachers, staff, adjuncts)

> (d)   incurred costs for future recruiting, fundraising and capital improvements;

> (e)  future incurred costs for mitigation and remedial measures to be taken as a result of Defendants' acts and/or omissions;

> (f)  legal costs associated with this suit;

> (g) damages stakeholders may have to pay as a result of lost earnings, school transfers, displacement, reputational damage, loss of opportunity associated with college entrance and examinations, lost opportunity at transferred-to schools as a result of displacement; and other intangible damages suffered as a result of the loss of a centennial all-girls educational institution that Our Lady of Mercy Academy remained until Defendants' caused its demise.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs pray:

1.    That the Court determine the claims brough by the Class may be maintained as a class action; That judgment be entered n favor of Plaintiffs and against Defendant;

2.    For an award of damages, including actual, nominal and consequential damages, as allows by law in an amount to be determined;

3.      For punitive and treble damages, if permitted by law;

4.      For prejudgment interest on all amounts awarded;

5.      That Defendants, its affiliates, successors, transferees, assignees, and the officers, directors, partners, agents, and employees thereof, and all other persons acting or claiming to act on their behalf or in concert with them, be permanently enjoined and restrained from in any manner continuing, maintaining, or renewing the conduct, contract, conspiracy or combination alleged herein, or from entering into any other conspiracy alleged herein, or from entering into any other contract having a similar purpose or effect, and from adopting or following an practice, plan, program, or device having a similar purpose or effect.

6.      That Defendant Board Members and Defendants' entities be ousted from the operation of Our Lady of Mercy Academy.

7.      That Defendants collectively provide an accounting of documents to Plaintiffs, who will gather for the restructuring of the school and repurposing of a new Board;

**Compensatory Damages**

8.      Plaintiffs repeat, reallege and reiterate all foregoing paragraphs as if fully set forth herein.

9.      Money damages along are insufficient and inadequate to accomplish justice.

10.     The subject of the contracts are unique.

11.     There is certainly uncertainty in calculating damages.

12.     It is not difficult for the Court to supervise the award of compensatory damages in this case.

13.     Compensatory damages would not cause hostile parties to work together in this case where ouster of the Board of Directors is necessary.

**Restitution**

14.     Defendants were unjustly enriched.

15.     Defendants' unjust enrichment inured at Plaintiffs' expense.

16.     It would be unjust to allow Defendants to retain the benefit of monies paid at Plaintiffs' expense.

17.     Plaintiffs did not pay the monies to Defendants as a gift to Defendants, but for the benefit of Our Lady of Mercy Academy.

18.     The benefit of Defendants' unjust enrichment must be restored to Plaintiffs for the benefit of Our Lady of Mercy Academy.

**Lost Profits**

19.     Plaintiffs allege lost profits to the extent that lost profits will be incurred if Defendants, as the breaching party, do not perform its agreed-upon contractual obligations and/or are directed to specific performance, along with potential collateral exchanges.

**JURY TRIAL DEMANDED**

Plaintiffs hereby demand a trial by jury for all causes of action, claims or issues in this action which are triable as a matter of right to a jury.

DATED:  April 8, 2024
Woodbury, New York

BY:  Amanda S. Reynolds
Amanda S. Reynolds, Esq.
Attorney for Plaintiffs
3 Harvard Drive
Woodbury, NY 11797
AmandaSReynolds@gmail.com

(516) 367-9795